## THE WYOMING.

### (District Court, S. D. New York. December 18, 1905.)

COLLISION—FERRYBOAT AND OVERTAKING TUG—CHANGE OF COURSE IN VIOLATION OF AGREEMENT BY SIGNAL.

A collision occurred in East river between a ferryboat which was proceeding down the river on her trip from Brooklyn to her slip below on the Manhattan side and an overtaking tug which was passing down the river. It was agreed by signal that the tug should pass to the right, and when she was abreast of the ferryboat one of the vessels sheered and the collision occurred. *Held*, on conflicting evidence, that the place of collision was only a short distance above the ferryboat's slip, and that the collision occurred by reason of her changing her course in order to make her slip in violation of the passing agreement.

[Ed. Note.—Collision by overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

In Admiralty. Suit for collision.

Wing, Putnam & Burlingham, for libellants.
Wilcox & Green, for claimant.

ADAMS, District Judge. This action was brought by John D. Dailey and others, the owners of the steamtug Harry G. Runkle, against the ferryboat Wyoming, to recover the damages sustained by them through a collision which happened between the vessels in the East River a little after 4 o'clock in the morning of the 14th day of February, 1905. The Wyoming left her slip at the foot of South Eighth Street, Brooklyn, shortly before the collision, bound for her slip at the foot of Roosevelt Street, Manhattan. The Runkle was proceeding from the foot of Stanton Street, East River, to Canal Street, North River, light. The latter was astern of the Wyoming in going down the East River and proceeding much faster. When she approached astern of the Wyoming, she blew a signal of one blast, signifying her intention of passing to the right. The Wyoming answered with a similar signal and the Runkle attempted to pass that side, when one of the vessels changed her course and a collision ensued, the bow of the Wyoming coming in contact with the port side of the Runkle, from 15 to 30 feet forward of the stern, doing some slight damage to the Wyoming and considerable to the Runkle. The tide was the last of the flood. It was a clear night, dark but good for seeing lights.

Each vessel charges the other with fault in not keeping her course under the agreement and the sole question to be determined is, which one sheered.

The libellants examined three witnesses from their boat; the pilot, who was at the wheel, the master who was writing in the room aft of the pilot house and came there when the whistles were exchanged, and the engineer who was operating the engine. There was a man on the forward deck but he was not examined because he was on the way to Panama. No reason appears, however, to account for the failure to examine him by deposition. It was stated that the latter was coiling down some lines. The accounts of the witnesses in the pilot house

were that the boats were proceeding rather on the Brooklyn side of the river, when the whistles were exchanged and they proceeded in that way until the ferryboat suddenly sheered to the starboard, causing the collision. The engineer saw nothing of the ferryboat before the collision.

The claimant examined six witnesses from its boat; the master at the wheel, a deck hand, a licensed man, in the pilot house and assisting in handling the wheel, a deck hand stationed on the deck forward as lookout, the engineer who was operating the engine, and two passengers, who were sitting in the after cabin on the Manhattan side. Their account of the matter was that the ferryboat was proceeding down the river rather on the Manhattan side and when the signals were exchanged, the tug was approaching from behind and shortly came abreast of the Wyoming, when the tug turned sharply to the port and ran into the ferryboat.

In the original libel, the Wyoming was described as bound from Williamsburgh to Catherine Street, Manhattan, and it is not stated where the collision occurred, nor is it stated in the answer. In the testimony of the libellants, however, it is claimed that the collision happened about 900 feet above the Roosevelt Street slips. The principal part of the testimony on the part of the ferryboat corresponds with such estimate. The master said the collision occurred 5 or 6 piers, 1000 or 1500 feet, above his slip, which was the lower one at Roosevelt Street; the statements of the two deck hands on duty are in conformity with such estimate. That of the engineer, however, differs and makes it a shorter distance from the slip.

The tug claimed that her course was well on the Brooklyn shore and the ferryboat 150 to 200 feet inside, nearer Brooklyn. On the other hand, the ferryboat claimed while she usually passed down on the Brooklyn side, on this occasion she was nearer Manhattan and the tug inside of her, about the distance claimed by the tug, because of an accumulation of ice on the Brooklyn side, which it was necessary to avoid. The preponderance of the testimony sustains the ferryboat's contention in this respect.

There would be little difficulty in concluding that the sheer which was made was that of the tug, were it not for the absence of any probability that she would turn for any purpose of her own. She was not near any point in the river which required any substantial change in her direction down the river, nor was the ferryboat, unless she was much nearer her slip than the testimony, alluded to above, would indicate. If she was near her slip, there was a strong probability that she changed in order to make it. The libellants rely very strongly upon the testimony of the engineer of the ferryboat to sustain a claim that the boat was nearing her slip and turned to the starboard to reach it. The engineer stated that he could not say opposite what point the boat was when he looked out of his window just after the collision; he saw down the river, the bridge and his slip, and received orders to go ahead full speed, which he did and it took less than a minute, while the engine was making 15 or 18 turns, to get into the slip. 24 turns a minute

was the regular full speed so that the distance was considerably less than a minute of full speed.

If the ferryboat reached her slip in such time, which there does not seem to be any reason to doubt, it is clear that she could not have been far from her slip. If it be assumed that her speed before the collision, under the reduction, was about 3 knots per hour, or 300 feet per minute, and it was not changed materially, a full minute would only have sufficed to place her that distance from her slip. If after the collision, under the full speed of her engines which was then given her, she made more headway, it is not probable that it greatly exceeded the previous rate because there was not time for any material acceleration. In any way that the matter can be viewed, so far as appears to me, the engineer's testimony is persuasive of a close approach to the slip, and the collision having been on the Manhattan side, she evidently was very little above her slip at the time of contact. I feel constrained to disregard the statements showing a position further up the river at the time and adopt the engineer's testimony as establishing that the collision occurred when the ferryboat was in a position to turn for her slip and that she changed to the starboard for the purpose of making it.

This conclusion requires a decree for the libellants, with an order of reference.